# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
January 13, 2015 Session

## STATE OF TENNESSEE v. THOMAS L. COPE

### Appeal from the Circuit Court for Warren County
### No. F-13962     Larry B. Stanley, Jr., Judge

---

### No. M2014-00775-CCA-R3-CD – Filed August 14, 2015

---

Following a bench trial, the defendant, Thomas L. Cope, was convicted of reckless aggravated assault, reckless endangerment with a deadly weapon, violation of the open container law, and failure to yield the right of way.  The reckless endangerment conviction was merged into the aggravated assault conviction, for which the defendant was sentenced to three years at 30% and a concurrent sentence of thirty days for failure to yield the right of way.  The effective three-year sentence was ordered to be served by split confinement with 210 days' incarceration with the balance of the sentence served on supervised probation.  He was fined $50 for violation of the open container law, with the same punishment for his conviction for failure to yield.  On appeal, the defendant argues that the evidence is insufficient to sustain his conviction for reckless aggravated assault. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Hilton Conger, Smithville, Tennessee, for the Appellant, Thomas L. Cope.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Darrell R. Julian, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## FACTS

At approximately 3:15 p.m. on April 12, 2012, a vehicle driven by the defendant ran a red light and struck the vehicle being operated by the victim, which had the right of way, causing serious injuries to the victim. Tests showed that the defendant had a blood-alcohol level of .02 and 31.6 nanograms per milliliter of Alprazolam in his blood.

Chris McCormick testified that on April 12, 2012, the day of the offense, he was driving in Manchester, intending to turn left off Old Well Road onto Highway 55. The light was red as he arrived at the intersection. A Titan pickup truck was in front of him at the red light. As the light changed, the Titan truck began moving forward, as did Mr. McCormick's vehicle. He heard a horn blow, and then it "sounded like a bomb went off," as a red car coming from the left hit the Titan. Pieces from the Titan began to fly through the air and it spun around. From the impact, he thought both of the drivers probably were dead. Mr. McCormick went to the red car, which was driven by the defendant, and saw he was leaning over the steering wheel, "kind of dazed." The defendant was moaning and said to Mr. McCormick, "[G]et this out, get this out," referring to a six-pack of beer on the passenger side floorboard. Mr. McCormick refused to do so. Then, a truck driver who was in a vehicle at the intersection came to the car, and the defendant also asked him to remove the beer. The truck driver refused the defendant's request.

Bryan Ogden testified that he had been at the intersection in a car being driven by his fiancée, Tammy Fitts. They were in the turn lane waiting for the light to change. When the traffic light facing them turned green, Ms. Fitts did not start her turn but said, "I don't think that car is going to stop." He said that he did not see the car's brake lights come on. Ms. Fitts blew her horn, the vehicle next to them on the right started forward, and the "red car T-boned him in the side." Mr. Ogden went to the defendant's vehicle and heard the defendant mumble something. The defendant said, "[C]an you take this?" and Mr. Ogden assumed he was talking about the beer, although he did not see any at the time.

Tammy Fitts testified that she had been driving the vehicle in which Mr. Ogden was the passenger and had stopped at the red light. When the light changed to green, she looked to see if another car was coming through the intersection and saw a red car, "going too fast," with no indication of stopping. To call attention to the danger, she blew her horn. After the collision, she called 9-1-1 for assistance.

2

Donald Hillis testified that he was trained as a paramedic and was in a vehicle with his wife as they came upon the scene of the crash. He went to the defendant's car, recognized him as someone he knew by name, and saw the defendant was in shock. Mr. Hillis knew the defendant through the defendant's employment in the funeral business. The defendant stated that his foot and hip hurt, and Mr. Hillis used a C-spine device to hold the defendant's neck in place. He said he did not smell beer in the defendant's vehicle, but the defendant told him there was beer in there.

Mark Fann testified that he was driving the black Titan pickup truck at the time of the wreck. He was in the outside turning lane, waiting for the light to turn green. When it did so, he looked to the right and left to see if other vehicles were coming, and, not seeing one, he drove into the intersection. His vehicle was hit by a red car, spun around, and was totaled. Mr. Fann's injuries included: a permanent indentation in the back of his head; a torn labrum in his left shoulder, requiring surgery; three fractured ribs on his left side; two fractures in his right knee; and permanent nerve damage in his left rib cage because of the broken ribs. He said he got stiff when he sat, and "nothing [was] the same anymore." As for his medical expenses, the cost of the helicopter taking him to the hospital was $20,000, his additional medical expenses were $80,000, and he was continuing to take medication for pain and for the damage to his ribs. At the time of the incident, he was working part-time. He was off work for six and one-half months due to injuries he sustained in the accident.

Trooper Gary Myers testified that on April 12, 2012, the day of the incident, he received a call from the dispatcher regarding a crash on Highway 55. He described what he observed upon arrival at the scene:

> It was a clear day when I arrived on the crash scene. Initially when I pulled up I observed a small Chevrolet Aveo four-passenger car and a black Nissan Titan truck. It was right at the intersection of where the two roads come together, Old Wells and Highway 55. From initial view when I pulled up on the scene it was clear that from the impact that the red vehicle had struck the black Nissan Titan . . . just in front of the driver's door traveling West as the – looked like the black Nissan truck was pulling onto Highway 55 from Old Well[s] Road and after impact both vehicles c[a]me to rest in the westbound lane of Highway 55.

Trooper Myers said he looked inside both vehicles. The interior of the Nissan truck was clean, but on the floorboard of the red Chevrolet car there was a six-pack of Michelob Ultra beer, with two of the containers open. One may have been opened by the impact, but the other was still cold and had "maybe one small sip left." He smelled alcohol on the defendant's clothing as well as on his breath. Accordingly, blood was

drawn from the defendant to determine his blood-alcohol content. Based upon his interviews of witnesses and what he observed at the scene, Trooper Myers determined that the defendant was responsible for the crash. Because of the severity of the crash, he did not attempt to talk to the defendant.

On cross-examination, Trooper Myers said that he had "no recollection" of the position of the sun having been a factor in the crash, although the defendant had said the sun was in his eyes.

Special Agent/Forensic Scientist April Bramlage of the Tennessee Bureau of Investigation ("TBI") testified that she had previously been qualified as an expert witness in toxicology, and the trial court qualified her as such. She said that the defendant's blood-alcohol level following the crash was 0.02. TBI Special Agent Dawn Sweeney tested the defendant's blood for drugs and found the presence of Alprazolam, also known as Xanax, at a level of 31.6 nanograms per milliliter. Agent Bramlage said that warnings were given to persons that Xanax "can cause sedation and drowsiness and they can affect your driving." She described the result when Alprazolam and alcohol both have been consumed:

> Those two drugs together, alcohol and Alprazolam, and again there is a specific warning against consuming alcohol with Alprazolam and benzodiazepines. The reason of that is they act on the same receptors in the brain. So they cause the same effects, sedation, an increase in reaction time. It's going to take you longer to react to something, lack of coordination, inability to multi-task properly, problems with attention and holding attention and these are all type things that are necessary for operating a motor vehicle.
>
> . . . .
>
> They're causing at least an additive effect meaning that taking one could cause some problems. You put them together now you're going to increase the effect of those and cause more problems. For the most part it is additive. Some individuals it could be a synergistic, meaning that one plus one doesn't equal two, one plus one equals four. Depends on the individual and their response to that drug.

On cross-examination, Agent Bramlage said that the therapeutic range for Alprazolam was 20 to 102 nanograms per milliliter. [110] On redirect examination, she said that Alprazolam and alcohol "increase[d] the effect of each other."

Following this testimony, the State rested its case-in-chief.

Dr. Opless Walker testified that he had a bachelor of science degree in pharmacy, was a licensed pharmacist, and had a doctorate in pharmacology. He was allowed to testify as an expert witness. He disagreed with the testimony of Agent Bramlage, saying the defendant's level of alcohol and drugs was "not consistent with a drug interaction." He testified that the defendant's blood-alcohol level of 0.02 would result from drinking "two-thirds of a 12-ounce can of beer." Dr. Walker opined that based upon this alcohol level and 31.6 nanograms of Alprazolam at the time of the collision, the defendant was not impaired at the time of the collision. Dr. Walker testified that because the defendant had been taking Alprazolam for a number of years, his behavior on the day of the collision would have been affected "[n]one whatsoever."

Brett Bouldin testified that his mother previously had been married to the defendant. He said that on the day of the collision, he telephoned the defendant between 1:50 and 2:00 p.m., seeking help moving furniture for his mother into a new townhouse. They worked together, finishing around 3:00 p.m. The defendant did not appear to be impaired or have an odor of alcohol about him. Mr. Bouldin said that about fifteen minutes later, he received a call from his wife who said that the defendant had just been "airlifted."

On cross-examination, the witness acknowledged that he did not know whether the defendant had purchased alcohol after they parted, or what medications he had been taking.

The defendant testified that he was fifty-four years old and a licensed funeral director and embalmer. At the time of the collision, he was working as an embalmer on a contract basis. On the morning of the collision, he embalmed a body at a funeral home in Manchester. Prior to this he had taken his prescribed dosage of Xanax (Alprazolam), a drug he had been taking since 2003. On occasions, he took less of the medication than prescribed, but never more. That afternoon, he was planning on attending his daughter's softball game in Fayetteville. Before that, he began working on his tax return, which was due in three days, and stopped at his mother's house to use her calculator. While there, he ate a sandwich and drank a beer. The beer that was in his car at the time of the collision was a six-pack he had brought from his house to his mother's home.

He said he may have consumed "one and a half or two beers" but no more than that. He said he returned the empty bottles to the carton, which he put in his car. While at his mother's home, the defendant received a telephone call from Brent Bouldin, asking that he help move furniture. The defendant testified that after helping move the furniture he took a direct route to where the crash occurred and made no stops along the way.

5

Explaining why he did not stop for the red light, the defendant said, "[T]he sunlight was in my eyes and I just didn't see the red light. I just didn't see it." He said he was not impaired by drugs or alcohol at the time of the crash. As a result of the collision, he sustained a crushed ankle, leaving numbness in his ankle and foot, and had a plate in his wrist. He said he did not deny that the collision was his fault.

On cross-examination, the defendant acknowledged that he was familiar with the intersection where the crash occurred as well as the straight portion of the road leading to the red light at the intersection. He agreed that he had been through the light many times and that the day was clear and sunny. He said that as he approached the intersection, his speed was "about 50, 55 miles an hour, 55" and he "thought [the light] was green. [He] didn't see it." He said he applied his brakes "at the last split second." The defendant agreed he knew that it was always dangerous to drink and drive and also take the medication. He said nothing was mechanically wrong with his vehicle. The defendant denied that he stopped after moving the furniture and purchased beer at the Country Club Market, or saying that he had done so.

By agreement of the parties, defense counsel orally related to the court the expected testimony of Mr. Randy Buckner, who owned the funeral home where the defendant embalmed a body on the morning of the collision:

> He owns Central Funeral Home in Manchester where [the defendant] testified he embalmed a body that morning. If Mr. Buckner – and he is under subpoena by the way, . . ., and the only reason he is not here right now is because as he told me he is a one-man-show and he had a funeral this afternoon and he expected to be here by 3:00 so but I would proffer his testimony to be that he was there with [the defendant] that morning. That [the defendant] did not appear to be impaired and he performed his services, did a beautiful job on the body and left at approximately noon with the parting words that he was going to his daughter's softball game.

Following this stipulation, the defense rested its case.

## ANALYSIS

On appeal, the defendant's single issue is that the evidence is insufficient to sustain the conviction for reckless aggravated assault.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). In a bench trial, as was this case, the verdict of the trial court is reviewed as would be a jury verdict. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

A person commits reckless aggravated assault when he or she "[r]ecklessly commits an assault as defined in § 39-13-101(a)(1), and the assault: (i) [r]esults in serious bodily injury to another; (ii) [r]esults in the death of another; or (iii) [i]nvolved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(B).

Regarding "reckless," Tennessee Code Annotated section 39-11-302(c) provides:

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

"'Serious bodily injury' means bodily injury that involves: a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34). A motor vehicle can constitute a deadly weapon for the purposes of aggravated assault. *State v. Tate*, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995). A person commits an assault who "intentionally, knowingly or recklessly causes bodily injury to another." T.C.A. § 39-13-101(a)(1).

7

Thus, for the evidence to be sufficient to sustain the conviction, the State was required to prove, beyond a reasonable doubt, that the defendant operated his vehicle recklessly as a deadly weapon and caused serious bodily injury to the victim.

Regarding his injuries, the victim testified that he had a permanent indentation in the back of his head and that he received medical treatment for a torn labrum in his left shoulder, three fractured ribs, and two fractures in his right knee. He had permanent nerve damage in his left rib cage, walked with a limp, and his knee became stiff when he sat. His total for medical bills was approximately $100,000. He was continuing to take pain medication for the damage to his ribs. Although he was unable to work for six and one-half months, he had returned to work at the time of trial. From this testimony, we conclude that a reasonable trier of fact could determine that the victim sustained serious bodily injury as the result of the collision.

Tammy Fitts, who was in a vehicle stopped at the same red light as the victim, testified, as did the victim, the traffic light facing them had turned from red to green before the defendant's vehicle came into the intersection. Ms. Fitts said that the defendant's vehicle was "going too fast," and she saw that it was not going to stop. Trooper Gary Myers testified that the collision occurred on a clear day, and on the floor of the defendant's vehicle was a six-pack of Michelob Ultra beer, with "two to three" open, but one may have come open during the impact. He smelled alcohol on the defendant's breath and clothing. He did not recall the sun's position being any factor in the crash.

TBI Special Agent April Bramlage testified that testing of the defendant's blood following the accident showed a blood-alcohol level of 0.02 and the presence of Alprazolam, also known as Xanax, at a level of 31.6 nanograms per milliliter. She said there was a specific warning against consuming together alcohol and Alprazolam because they "cause the same effects, sedation, an increase in reaction time." She testified that warnings are given to persons taking Alprazolam that it "can cause sedation and drowsiness and [ ] can affect your driving."

The facts of this case are very similar to those in *State v. Charles Edward Graham*, No. E2005-02937-CCA-R3-CD, 2008 WL 199851, at *1-2 (Tenn. Crim. App. Jan. 24, 2008), *perm. app. denied* (Tenn. Sept. 15, 2008), where the defendant had been driving erratically before the accident, and his vehicle jumped a curb and struck a vehicle waiting to turn out of a restaurant, seriously injuring its driver. The arresting officer testified that, in the defendant's vehicle, he found partially smoked marijuana cigarettes, one of which the defendant tried to reclaim from the officer and destroy. *Id.* at *3. In the officer's opinion, the defendant in that case was under the influence and unable to drive. The jury convicted the defendant of reckless aggravated assault, and this court

determined, following the appeal, that the evidence was sufficient to sustain the conviction, pointing to the defendant's erratic driving prior to the accident, running his vehicle over a curb, and striking a stationary vehicle.

In the present case, a reasonable trier of fact could have accredited the testimony of Trooper Myers that the day was clear; the testimony of Tammy Fitts that the defendant's vehicle was going too fast as it came into the intersection; the testimony of Bryan Ogden that he did not see the defendant's brake lights come on; and the testimony of Special Agent Bramlage that the combination of alcohol and Alprazolam together would have affected the defendant's driving. A trier of fact could reasonably conclude beyond a reasonable doubt that when the defendant consumed alcohol along with Alprazolam and drove his vehicle, he was recklessly operating his vehicle on a public highway while under the influence of these substances which affected his reaction time, coordination, ability to multi-task, and his ability to pay attention to his surroundings. Under the circumstances he disregarded the substantial risk that he would fail to notice a traffic control device in time to avoid a collision at a busy intersection, and this would be compounded by an inability to react in time to avoid the imminent collision caused by his failure to obey the traffic control device. This is especially true considering that the defendant claimed the sun was in his eyes – if the trier of fact believed that testimony by the defendant, then defendant's driving at the speed of 50 to 55 m.p.h. when he could not see whether the light was red or green was definitely a gross deviation from the standard of care.

We conclude that a defendant need not be guilty of DUI or DUI per se in violation of Tennessee Code Annotated section 55-10-401 in order for conduct related to the operation of a motor vehicle to "constitute[ ] a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." T.C.A. § 39-11-302(c).

The defendant is not entitled to relief in this appeal.

## CONCLUSION

Based upon our review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE